■ In the Matter of Construction and Reformation of MATTHEWS TRUST NO. 1. WILLIAM MORRISON MATTHEWS et al., Respondents, v CADWALADER, WICKERSHAM & TAFT, LLP, Appellant, et al., Respondent. In the Matter of Appointment of PAUL W. MOURNING, as Successor Trustee of MATTHEWS TRUST NO. 1. PAUL W. MOURNING, Appellant, v WILLIAM MORRISON MATTHEWS et al., Respondents. [878 NYS2d 8]—

Order, Surrogate's Court, New York County (Renee R. Roth, S.), entered June 25, 2008, which denied petitioner Mourning's motion for summary judgment to compel respondent Bank of New York to appoint him as individual trustee for the subject trusts, and which granted the motions of petitioner beneficiaries of the trust to dismiss Mourning's petition, unanimously reversed, on the law, the dismissal motions denied, and the petition reinstated and granted.

This is an appeal from the Surrogate's denial of petitioner Mourning's motion to compel the appointment of a member of the Cadwalader, Wickersham & Taft law firm (Cadwalader) as the individual trustee of certain trusts. There are four trusts at issue. Three were established for the benefit of the grantor's two sons in 1957, and one for her nephew in 1964. These are inter vivos trusts, continuing until the beneficiaries pass away, and are irrevocable. At the time the trusts were created, the sons were 19 and 8 years old respectively, and at the time the nephew's trust was created, he was 33 years old.

The corporate trustee of all four trusts from the time of their creation to the present is the Bank of New York (BNY). The

initial individual trustee of two of the trusts was Robert E. Lee, a member of the Cadwalader law firm; the initial individual trustee of a third trust was Andrew Oliver, who was not associated with Cadwalader. When Oliver resigned in 1961, Lee was appointed successor trustee in accordance with a provision (article Tenth) of that trust specifically naming him and Cadwalader. The individual trustee of the fourth trust, created in 1964, after Lee's death, was William Moss, a Cadwalader partner who was also appointed trustee of the other three trusts upon Lee's death in 1963 in accordance with article Tenth of the trust instruments.

Each of the four trusts included a substantially identical article Tenth providing that, in the event of death or resignation of an individual trustee, BNY was to direct the appointment of a successor trustee. Such successor trustee was to be a member of the Cadwalader law firm and designated by the law firm "as most familiar with the affairs of the Grantor." Under the instruments, in the event of a dispute between the trustees, the decision of the individual trustee would control.

The grantor died in 1979. William Moss continued to serve as trustee until his death in 2005. At that time, Cadwalader again proposed a member of the firm as successor trustee, Paul Mourning. However, because of objections by the beneficiaries, corporate trustee BNY refused to appoint Mourning.

Mourning then commenced a proceeding in Supreme Court, Dutchess County, seeking to compel his appointment. The beneficiaries commenced a proceeding in New York County Surrogate's Court seeking to block the appointment. Eventually, the actions were consolidated before the Surrogate in New York County.

The Surrogate found that the plain language of article Tenth conditioned Cadwalader's power to designate a trustee on its continuing to perform other, unspecified legal work for the grantor. Because the firm had not done so for decades, the Surrogate determined that Cadwalader had no right to name the successor trustee. The Surrogate denied Mourning's motion for summary judgment and granted the beneficiaries' motions to dismiss.

For the reasons set forth below, we disagree, and reverse. It is well established that, unless ambiguous, the plain language of the trust document must be given full force and effect (*see Matter of Chase Manhattan Bank*, 6 NY3d 456, 460 [2006] [" 'trust instrument is to be construed as written and the settlor's intention determined solely from the unambiguous language of the instrument itself' " (citations omitted)]). Article Tenth of the

trust instruments provides in relevant portion: "If at any time and from time to time due to death, resignation or other cause there shall be only one Trustee acting hereunder, such sole acting Trustee is directed to appoint such member of the firm of Cadwalader, Wickersham & Taft (or any successor firm) as may be designated by said firm as most familiar with the affairs of the Grantor, successor Trustee by an instrument in writing."

The Surrogate interpreted article Tenth to require that any member of Cadwalader designated as trustee must be "familiar" with the grantor's *personal* affairs, and that this, in turn, meant that the person had to be familiar with more than just the trust instruments. From this the Surrogate then reasoned that familiarity with personal affairs could only be achieved if the grantor remained a client of Cadwalader's, and in this way "grantor was at least able to make sure that any such authority [the power of appointment] could be wielded only by those who retained her confidence over time."

The Surrogate concluded that the grantor "was apparently determined that (to the extent practicable) Cadwalader's considerable power to influence the administration of the trusts would not outlast her confidence in the firm." Given the Surrogate's finding that in the mid-1970s, the grantor took her legal business to another law firm in the city (Sullivan and Cromwell) and that neither Cadwalader nor Moss had any further dealings in her personal matters, the Surrogate ruled against petitioners Mourning and Cadwalader.

We find that in so construing article Tenth, the Surrogate impermissibly excised a word from the clause (*see Matter of Buechner*, 226 NY 440, 443 [1919] [error to excise word "living" from clause in will describing class of heirs]). As Mourning correctly asserts, the Surrogate excised the word "most" out of article Tenth. This necessarily resulted in a tortuous interpretation of what is, essentially, clear language. The requirements for appointing a successor trustee according to the plain language of the provisions are (1) that the trustee is a member of the Cadwalader law firm and (2) the Cadwalader member appointed will be the one *most* familiar with the grantor's affairs as compared to other members of the firm. This provision makes plain that the group from which a successor trustee is to be picked is the membership of Cadwalader. The criteria for choosing *which member* is the one who has the most familiarity with the grantor's affairs.

On appeal, the beneficiaries argue that the purpose of the trusts supports their reading that "affairs" cannot include the trusts, but must exclude them and refer only to other matters.

Specifically, they point to the Surrogate's finding that the grantor must have wanted Cadwalader to have the power to appoint only so long as the firm held her confidence generally. The problem with this argument is that the document simply does not say this.

The Surrogate may have been correct that the term "affairs of the [g]rantor" is broader than the instant trusts. However, as Mourning notes, the phrase may not be fairly read to exclude the trusts (*see e.g. Teets v United States*, 29 Fed Cl 697, 710 [1993] [using term "affairs" to include certain trusts]). The grantor invested a considerable sum (now worth some $250 million) in the trusts, dictated their terms, chose the trustees and the beneficiaries. Under the plain meaning of the words, the trusts must be included in her "affairs."

In any event, as Mourning correctly counters, the "purpose" of the trust cuts the other way. Given the young age of the beneficiaries at the time of the creation of the trusts, the grantor must have known that she would almost certainly predecease them, and the expiration of the trusts. As such, the grantor foresaw that a time would come when she had no affairs other than the trusts. Her goal then, was to ensure that a member of the firm she had chosen to designate the trustees would have an incentive to remain familiar with the trusts, and thus serve as a competent trustee even after her death.

Moreover, there is little merit in the beneficiaries' argument that the reference to "any successor firm" indicates an intention by the grantor that there might at some point be a firm other than Cadwalader who would act to appoint the trustee. A reading more consistent with the remainder of the language of article Tenth is that the phrase "any successor firm" refers to the possibility that, if Cadwalader were to merge, or reorganize, the appointment power would travel with Cadwalader to the successor. Had the grantor wanted the appointment power to follow her to any law firm she subsequently retained to manage all her legal affairs, she could easily have included this in article Tenth.

Petitioner Mourning further correctly argues that the Surrogate's interpretation of article Tenth places an impermissible condition precedent on Cadwalader's appointment power. Such conditions cannot be found or gratuitously implied (*see Stratis v Doyle*, 176 AD2d 1096, 1098 [1991] ["(c)onditions subsequent are disfavored and are not found to exist unless the intention to create them is clearly expressed"]; *Lui v Park Ridge at Terryville Assn.*, 196 AD2d 579, 582 [1993] ["the law does not favor a construction which creates a condition precedent"]). Certainly

there was no clear expression in the trust documents that Cadwalader's power to appoint is predicated on its continued representation of the grantor in other matters. On the contrary, the sole condition could not be more clearly expressed: that only the member of Cadwalader "most familiar" with the grantor's affairs be named.

Finally, we find that beneficiaries' argument that article Tenth violates public policy is without merit. Beneficiaries' reliance on *Matter of Putnam* (257 NY 140 [1931] [an attorney who receives a bequest in a will he drafts must make an affirmative showing that there was no undue influence on his part]) and on *Matter of Weinstock* (40 NY2d 1 [1976]) is misplaced.

Mourning correctly contends that *Weinstock* expressly exempts attorney trustees from the rule in *Putnam*, and places no burden on an attorney trustee who drafted the instrument to justify his appointment. In *Weinstock*, an attorney retained to draft a will persuaded the testator to name him and his son as executors, thus allowing each to collect the statutory fee. The Surrogate concluded that the two had perpetrated a constructive fraud on the testator. In affirming, the Court of Appeals was careful to distinguish this situation from that of an attorney/beneficiary: "In reaching the conclusion we do in this instance, we do not wish to be understood as implying that when a testator selects the attorney who draws his will as his executor any presumption or inference of impropriety arises from the circumstance that such attorney is otherwise a stranger. *That fact alone does not give rise to any obligation on the part of the attorney to come forward with an explanation . . .* [I]t is only where, as here, the evidence warrants an affirmative finding of impropriety and overreaching, predicated on more than the fact of appointment, that courts would be warranted in interfering with the testator's manifested intention and excluding the attorney as executor." (*Matter of Weinstock*, 40 NY2d 1, 7 [1976] [emphasis added].)

As such, the burden of showing some impropriety or overreaching is on the beneficiaries, and they do not even attempt to meet that burden.

Hence, the Surrogate erred in criticizing the provision as allowing the firm "a self-perpetuating hold on a trusteeship (and likely concomitant expectation of substantial trustee's commissions and legal fees) presumably over the course of many years . . . If such were the result of the Provision drafted by Cadwalader, it would raise the specter of overreaching by an attorney."

Even if the extrinsic evidence that the grantor consulted or

retained new counsel was admissible, it would support her expressed intention that the trustee appointment provisions were to last beyond her lifetime. Indeed, at the time the grantor retained new counsel in the mid-1970s she could have taken steps to terminate the trusts and with them the Cadwalader trusteeships had she decided that she no longer had confidence in the firm regarding the trust instruments. EPTL 7-1.9 (a) permits the creator of an irrevocable trust to revoke or amend the whole or any part "[u]pon the written consent . . . of all the persons beneficially interested in a trust."

Nothing in the record reflects any intention of the grantor to do so. Cadwalader's trusteeship of the trust instruments lasted for 22 years during the grantor's lifetime. During that period, the grantor was undoubtedly aware of the financial impact of its trusteeships. Further, there is no allegation or assertion made that she asked Cadwalader to relinquish its designation function nor any evidence that after retaining new counsel the grantor made any effort to revoke or amend the trust indentures or that she was dissatisfied in any way with the operation of article Tenth. Accordingly, there is no basis to strike the unambiguous terms of the trust instruments. Concur—Gonzalez, P.J., Mazzarelli, Friedman, Catterson and Renwick, JJ.